IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

RUSSELL E. PARKER          §
                           §
VS.                        §    CIVIL ACTION NO.4:06-CV-694-Y
                           §
AMERICAN AIRLINES, INC.    §

ORDER PARTIALLY GRANTING AND
PARTIALLY DENYING MOTION FOR SUMMARY JUDGMENT

Plaintiff Russell E. Parker has brought suit against defendant American Airlines, Incorporated ("American"), for disability discrimination under the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* ("ADA"), and for retaliation in violation of the Texas Workers' Compensation Act, Texas Labor Code § 451.001. Parker alleges that American discriminated against him on the bases of his having a record of a disability and American's regarding him as being disabled. Parker also complains that American retaliated against him for filing a workers' compensation claim.

American has filed a motion (doc. #53) for summary judgment. After review, the Court concludes that the motion should be PARTIALLY GRANTED AND PARTIALLY DENIED.


I.   Factual Background

Parker began working for American as an aircraft-maintenance technician ("AMT") sometime in 2000. The AMT position is a safety-sensitive position, so AMTs must work according to Federal Aviation Administration ("FAA") regulations. An AMT's duties and responsi-bilities include troubleshooting and repairing American's commer-

cial aircraft.  AMTs must be able to maneuver aircraft parts weighing up to sixty pounds; carry tools and equipment weighing up to 100 pounds; and move stairs, ladders, and scaffolding weighing up to 100 pounds.  AMTs work under intense pressure and under narrow time constraints.  The ability to work unsupervised and to sign off on mechanical flight releases (essentially certifying that the aircraft is airworthy) are essential to performing the job.

In February 2003, Parker suffered an on-the-job injury when he fell down the stairs of a jet bridge and severely injured his knee. His injuries required substantial medical treatment and caused him to take a medical leave of absence.  While on medical leave, Parker began seeing Dr. Richard Yentis for treatment for depression.  Also while on leave, Parker was laid off as part of a company-wide reduction-in-force.

After recuperating, Parker applied for recall, exercising his rights under a collective-bargaining agreement.  But before being permitted to return to work, American required Parker to undergo a functional-capacity evaluation.  The evaluation was administered in December 2004 by a union-designated doctor.  The doctor's report noted that Parker was "under psychiatric care due to depression brought on" by his injury and that he "meets weekly with . . . Dr. Yentis, M.D., a psychiatrist."  (Pl.'s App. at 191.)  Although the evaluation revealed that Parker was capable of performing all of the physical demands of his AMT position, the report noted that

Parker "does, however, still have some depression and anxiety issues that need to continue to be addressed through one-on-one therapy sessions."[1] (*Id.* at 193.) Parker was released in April 2005 "without restrictions," and the results of the evaluation were submitted to American's medical review board ("medical board").[2] (*Id.* at 190.) He was still taking, however, the anti-depressant and anti-anxiety medications prescribed by Dr. Yentis.

Learning that Parker was taking medications for anxiety and depression, the medical board required Parker to undergo a series of tests called MicroCog screening tests designed to measure his cognitive skills. The medical board was concerned that Parker's medications could affect his cognitive abilities. The tests were administrated by independent psychologists and psychiatrists employed at Gentiva Health Services, Incorporated.

On the first test, which was administered in May 2005, Parker "scored in the impaired range in information processing accuracy (<1st percentile)." (Pl.'s App. at 181.) Parker's "exceptionally low score resulted in impaired composite scores of general

---

[1] In June 2005, however, Cigna Group Insurance, "the insurance carrier under which [Parker had] applied for disability benefits," faxed a "Physical Ability Assessment" form to Parker's orthopedic doctor. (Def.'s App. at 89.) On the form, the doctor indicated that Parker could not lift more than eleven to twenty pounds for more than two-and-a-half hours per day, could not carry more than ten pounds for more than two-and-a-half hours per day, and could not pull or push more than twenty pounds for more than two-and-a-half hours per day. (*Id.* at 89-90.)

[2] The medical board is comprised of physicians who evaluate individual cases to determine appropriate restrictions, work clearance, limits for duties, and other medical-related issues.

cognitive functioning and proficiency as well . . . ." (*Id.*)
Parker also scored very poorly in reasoning and calculation,
attention and mental control, and spatial processing and informa-
tion processing speed. Parker's only average score was reaction
time. (*Id.*)

Parker's scores raised "some concerns about his ability to
return to work . . . ." (*Id.*) According to the evaluators, the
test results suggested that Parker had weak reasoning skills that
raised questions regarding his ability to solve problems ade-
quately. They recommended that Parker "consult with his physician
regarding his medication to determine if any changes could be made
without compromising good control of his symptoms." (*Id.* at 182.)

American accepted this recommendation and Parker's medication
was adjusted. In June 2005, Parker underwent a second MicroCog
screening test. The results were similar. Parker "scored in the
impaired range in information processing speed," but his "informa-
tion processing accuracy improved . . . ." (*Id.* at 179.) This
suggested that Parker slowed his responses to improve his accuracy.
His attention and mental control, reasoning and calculation, and
memory all remained "below acceptable levels." (*Id.*)

The test revealed continued "concerns about [Parker's] ability
to perform his work functions . . . ." (*Id.* at 180.) The degree
to which Parker needed to slow down his processing speed "to reach
a minimally acceptable level of information processing accuracy"

suggested that Parker "continues to experience cognitive difficulties." (*Id.*)  It was recommended that Parker undergo "a full neuropsychological evaluation . . . ." (*Id.*)

American accepted this recommendation and referred Parker for a full neuropsychological assessment, which lasted nearly five hours.  The administering doctor found that various aspects of Parker's cognitive functioning, including attention, problem solving, and reasoning skills, were impaired.  He opined that Parker likely would be unable "to perform . . . aspects of his job" and that impairments in attention, processing speed, and problem solving raised "concerns about his ability to perform accurately and efficiently under stressful conditions." (*Id.* at 178.)  He recommended that Parker "be placed on safety restrictions, while his ability to perform his job" would be "assessed by his supervisors." (*Id.*)  He further recommended that Parker's performance "be directly supervised, especially to determine his accuracy." (*Id.*)

American's medical board reviewed the results of the MicroCog tests and the neuropsychological assessment and concluded that Parker should be permanently restricted from any "duties requiring sign off of mechanical flight releases." (*Id.* at 187.)  The medical board sent a letter to Parker informing him of this permanent restriction.  The letter also informed Parker that should his medical condition change, the board should be notified immediately and his case would be re-evaluated.  The letter further

directed Parker to contact his supervisor "to determine how your work restrictions might be accommodated . . . ." (*Id.*) Should an accommodation be impossible, the letter advised Parker to fax American the *Request for Accommodation* attached to the letter should he desire a "job search elsewhere" in American. (*Id.*) Parker admits that he never contacted his supervisor to request an accommodation, never submitted a request for a reasonable accommodation to American's Accommodation Review Board, never informed the board of any change to his medical condition, and never requested a re-evaluation of his condition.

Parker's restriction prohibits him from returning to his AMT position because it is essential that he have the ability to sign mechanical flight releases. But even without this restriction, Parker admits he cannot exercise his recall rights and return to his AMT position because he lacks the requisite seniority under the collective-bargaining agreement. (Def.'s App. at 23.)

In September 2005, Parker bid for a transfer to the position of parts washer, aircraft cleaner, or overhaul support mechanic. With his bid, Parker submitted a letter from Dr. Yentis informing American of his opinion that, after reviewing the essential job functions for the three positions, Parker could "perform all of the . . . positions" despite the medical board's restriction. (Pl.'s App. at 233.) Dr. Yentis conceded in his deposition, however, that he did not evaluate whether Parker could perform the physical

demands of the positions.  (Def.'s App. at 51-52.)

American awarded Parker the parts-washer position.  This position is a manual-labor position that did not require the use of complex cognitive skills nor did it require that Parker sign off on any mechanical flight releases.  As the title implies, the position requires the ability to clean various parts of an aircraft.  The position requires a high school education; a valid driver's license; the ability to work rotating shifts, including weekends, holidays, and days off; the ability to read, write, and fluency in English; and the ability to pass all necessary security screening for appropriate airport clearances.  An individual must also be able to lift fifty-pound parts for the purpose of cleaning, and the duties are performed within narrow time constraints.

After initially awarding Parker the parts-washer position, American revoked that award because of Parker's permanent restriction.  American has a policy in place that prohibits employees from exercising any contractual-transfer rights under the collective-bargaining agreement while that employee has a job restriction. Parker did not complain to anyone at American nor did he file a grievance.  Instead, Parker filed a discrimination claim with the Equal Employment Opportunity Commission several months later. Nevertheless, Parker "does not believe that American's failure to transfer him to the parts-washer position was because he opposed any unlawful practice, opposed discrimination, or filed a formal

complaint of discrimination." (Joint Pretrial Order at 9.)

Mesa Airlines hired Parker as a quality inspector in October 2005. While Parker's duties at Mesa are different from his AMT duties at American, there is some overlap. His responsibilities include inspecting the work of AMTs and signing off on repairs made as having been properly done.

## II. Analysis

### A. Summary-Judgment Standard

Summary judgment is proper when the record establishes "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). An issue is considered "genuine" if "it is real and substantial as opposed to merely formal, pretended, or a sham." *Bazan v. Hidalgo Cty.*, 246 F.3d 481, 489 (5th Cir. 2001). Facts are considered "material" if they "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To determine whether there are any genuine issues of material fact, the Court must first consult the applicable substantive law to ascertain what factual issues are material. *Lavespere v. Niagra Mach. & Tool Works*, 910 F.2d 167, 178 (5th Cir. 1990). Next, the Court must review the evidence on those issues, viewing the facts in the light most favorable to the nonmoving party. *Newell v. Oxford Mgmt. Inc.*, 912 F.2d 793, 795 (5th Cir.

1990).

In making its determination on the motion, the Court must look at the full record including the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits. *See* FED. R. CIV. P. 56(c); *Williams v. Adams*, 836 F.2d 958, 961 (5th Cir. 1988). Rule 56, however, "does not impose on the district court a duty to sift through the record in search of evidence to support" a party's motion for, or opposition to, summary judgment. *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir. 1992). Thus, parties should "identify specific evidence in the record, and . . . articulate" precisely how that evidence supports their claims. *Forsyth v. Barr*, 19 F.3d 1527, 1536 (5th Cir. 1994). Further, the Court's function is not to weigh the evidence, make credibility determinations or determine the truth of the matter; rather, the Court is to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249.

When the moving party has carried its summary-judgment burden, the respondent must go beyond the pleadings and produce evidence that sets forth specific facts showing there is a genuine issue for trial. *Celotex Corp v. Catrett*, 477 U.S. 317, 324 (1986); *see also* FED. R. CIV. P. 56(e). This burden is not satisfied by creating some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence. *See Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075

(5th Cir. 1994). If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *See Anderson*, 477 U.S. at 249-50.

B.  Discussion

1.  Statute of Limitations

American contends that Parker's ADA claim is barred by the statute of limitations. Under the ADA, a claimant must bring suit for disability discrimination no later than ninety days after receiving a right-to-sue notice from the EEOC. *See* 42 U.S.C. § 12117(a), referring to 42 U.S.C. § 2000e-5(f)(1); *Taylor v. Books a Million, Inc.,* 296 F.3d 376, 379 (5th Cir. 2002). Because Parker originally filed this suit in Texas state court, American contends that the ninety-day limitations period is governed by Texas substantive and procedural law.

Although acknowledging that Parker filed his discrimination case within the ninety-day period under the statute,[3] the crux of American's argument is that Parker did not exercise due diligence in effecting service of process before the expiration of the ninety-day period. American complains that it was not served until September 1, which is 131 days after Parker received the statutory notification. Because, American argues, Parker failed to exercise

_____

[3] Parker received the right-to-sue notification on April 24, 2006, and filed his suit on July 12——eighty days later.

10

due diligence to effect service, the date of its receipt of service should not relate back to the date of Parker's filing and, therefore, his ADA claim is barred by the statute of limitations.

Under Texas law, to bring suit within a limitations period, "a plaintiff must not only file suit within the applicable limitations period, but must also use due diligence to have the defendant served with process." *Grant v. DeLeon,* 786 S.W.2d 259, 260 Tex. 1990). Thus, if a plaintiff files his suit within the limitations period established under Texas law, but does not serve the defendant until after the limitations period has expired, "the date of service relates back to the date of filing if the plaintiff exercises due diligence in obtaining service." *Bella-Gonzalez v. Villa,* 57 S.W.3d 8, 11 (Tex.App.——Houston [14th Dist.] 2001, no pet.). This rule applies when Texas state-law claims are filed in federal courts. *See Walker v. Armco Steel Corp.,* 446 U.S. 740, 751 (1980). This is because "the policies behind *Erie* and *Ragan* control the issue whether, in the absence of a federal rule directly on point, state service requirements [that] are an integral part of the state statute of limitations should control in an action based on state law [that] is filed in federal court . . . ." *Id.* at 752.

But "when an underlying cause of action is based on federal law and the absence of an express federal statute of limitations makes it necessary to borrow a limitations period from another

statute, the action is not barred if it has been 'commenced' in compliance with [Federal Rule of Civil Procedure 3] within the borrowed period." *West v. Conrail,* 481 U.S. 35, 39 (1987). Applying this rule, the United States Court of Appeals for the Fifth Circuit held that the Texas tolling provisions do not apply to an action brought pursuant to *Bivans v. Six Unknown Named Agents of Fed. Bureau of Narcotics,* 403 U.S. 388 (1971). *McGuire v. Turnbo,* 137 F.3d 321, 324 (5th Cir. 1998).

Parker initially brought his federal disability-discrimination claim in Texas state court. As mentioned above, the ADA contains its own statute of limitations, which requires that an aggrieved party bring suit within ninety days of receiving a right-to-sue notice issued by the EEOC. *See* 42 U.S.C. § 12117(a); 42 U.S.C. § 2000e-5(f)(1). Although this requirement "is strictly construed," *See Taylor,* 296 F.3d at 379, because the ADA contains its own limitations period, the Court concludes that it is federal law that decides whether Parker has timely filed his ADA claim. This is true even though Parker initially filed his case in state court. Thus, because it is undisputed that Parker filed his suit within the ninety-day period required by the ADA, his suit is not time barred even though he did not serve American until forty-one days after the ninety-day limitations period had expired.[4]

---

[4] Although Parker did not serve American until after the ninety-day period had elapsed, he did effect service within the 120-day limit under Federal Rule of Civil Procedure 4. The interplay of Rule 4 and the ninety-day filing requirement cannot be ignored. If the ninety-day limitation were interpreted so

2.    Disability Discrimination

The ADA provides:

> No covered entity shall discriminate against a
> qualified individual with a disability because
> of the disability of such individual in regard
> to job application procedures, the hiring,
> advancement, or discharge of employees, em-
> ployee compensation, job training, and other
> terms, conditions, and privileges of employ-
> ment.

42 U.S.C. § 12112(a).   A plaintiff establishes a *prima facie*

disability-discrimination case when he demonstrates that "(1) he

has a 'disability'; (2) he is a 'qualified individual' for the job

in question; and, (3) an adverse employment decision was made

because of his disability." *Robertson, M.D. v. The Neuromedical

Center,* 161 F.3d 292, 294 (5th Cir. 1998); *see also Dupre v.

Charter Behavioral Health Sys*. *of Lafayette, Inc.,* 242 F.3d 610,

613 (5th Cir. 2001).   Once a plaintiff has made a *prima facie*

showing, "the burden then shifts to the defendant-employer to

articulate a legitimate, non-discriminatory reason for the adverse

employment action." *McInnis v. Alamo Cmty. Coll. Dist.,* 207 F.3d

276, 280 (5th Cir. 2000).   This is a burden of production, not

persuasion.   *See Woods v. Potter,* No. 4:06-CV-525-Y, 2008 U.S.

Dist. LEXIS 36652, *11 (N.D.Tex. Apr. 28, 2008)(Means, J.)("the

burden shifts to the defendant to articulate——but not prove——a

---

strictly, any plaintiff filing within the ninety-day period would have fewer than
ninety days, instead of 120 days, to effect service.  There is no indication that
Congress sought, when it required that a suit be "brought" within ninety days,
to abrogate the 120-day limit under Rule 4 to effect service of process.

legitimate, nondiscriminatory reason for the adverse employment action"). Should the defendant-employer meet its burden, the burden shifts back to the plaintiff "to establish by a preponderance of the evidence that the articulated reason was merely a pretext for unlawful discrimination." *McInnis,* 207 F.3d at 280.

Of course, a threshold requirement for a plaintiff in an ADA claim is that he must establish that he has a disability. *Waldrip v. General Electric Co.,* 325 F.3d 652, 654 (5th Cir. 2003). The ADA defines "disability" as either "(A) a physical or mental impairment that substantially limits one or more of the major life activities . . .; (B) a record of such an impairment; or, (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). Parker admits that at no time was he ever in fact disabled. Rather, Parker claims that American discriminated against him because it regarded him as being disabled and on the fact that he had a record of being disabled.


i.   Regarded as Disabled

American claims that there is no evidence that it ever regarded Parker as being disabled, and argues that Parker has failed to "demonstrate that American treated him as though he had an impairment that substantially limited a major life activity." (Def.'s Br. at 10.) The Court concludes otherwise. American's medical review board, after reviewing the MicroCog screening tests

14

and the neuropsychological assessment, imposed a permanent work restriction on Parker.  That restriction, it is undisputed, singly prevented Parker from being able to transfer to any other position in American.

One is regarded as having a disability if the individual (1) has an impairment that does not substantially limit a major life activity but the employer perceives the impairment as such; (2) has an impairment that substantially limits a major life activity only because of the attitude of the employer toward such an impairment; or (3) has no impairment at all but is regarded by the employer as having an impairment that substantially limits a major life activity.  *See Bridges v. City of Bossier,* 92 F.3d 329, 332 (5th Cir. 1996).  American's decision to place a permanent work restriction on Parker and preventing Parker from transferring to any other position in American suggests that American believed Parker suffered from an impairment that it perceived substantially limited a major life activity.  It also suggests that Parker had an impairment that substantially limited a major life activity only because of American's attitude toward his impairment.

The ADA does not define the terms "substantially limits" or "major life activity."  But in the context of employment discrimi-nation, Congress has tasked the EEOC with issuing regulations that address disability discrimination in the workplace.  *See* 42 U.S.C. § 12116; *Price v. The National Board of Medical Examiners,* 966 F.

Supp. 419, 425 (S.D.W.Va. 1997); *Bridges,* 92 F.3d at 332 (stating EEOC regulations "provide significant guidance"). "Such regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to statute." *Chevron U.S.A. Inc. v. NRDC, Inc.,* 467 U.S. 837, 844 (1984). Under EEOC regulations, working is considered a major life activity. *See* 29 C.F.R. § 1630.2(i).

In the context of working,

> the term *substantially limits* means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

29 C.F.R. § 1630.2(j)(3)(I) (emphasis added). A perception that an "impairment . . . affects only a narrow range of jobs can be regarded either as not reaching a major life activity or as not substantially limiting one." *Dutcher v. Ingalls Shipbuilding,* 53 F.3d 723, 727 (5th Cir. 1995).

American placed a permanent restriction on Parker after a series of tests revealed that Parker may suffer from substantial limitations in his cognitive abilities. Parker has presented evidence that his permanent restriction prevented him from transferring to any position in the entire company. That evidence implies that American regarded Parker as incapable of performing a

16

broad range of jobs, including jobs that required little cognitive ability.

American maintains that it assisted Parker in seeking another position in American, and American relies on the "uncontroverted" affidavit of Dr. Alex Wolbrink, American's representative on Parker's medical review board, who states that neither he nor anyone on the medical board ever regarded Parker as being disabled. American urges that the medical board's decision to place a permanent restriction on Parker was influenced entirely by the recommendations made by independent doctors after extensive testing, and not by any perception that it regarded Parker as disabled.

American's actions, however, speak for themselves. It may have assisted Parker in seeking another position in American, but it would not permit Parker to take any other position until his permanent restriction was lifted——regardless of whether the restriction would have any impact on Parker's ability to perform another job. And being regarded as disabled is not dependent on whether any manager, supervisor, or employee of American referred to Parker as disabled. American's medical board placed a permanent restriction on Parker based on its view that Parker's cognitive abilities were substantially impaired. That in turn prevented Parker from transferring to any other position in American.

Moreover, despite the fact that it was independent doctors who

conducted independent tests on Parker's cognitive abilities, a reasonable jury could find that American interpreted the recommendations from the independent doctors and the tests results as substantially limiting Parker from performing any class of jobs in American. It was American that decided to place a permanent restriction on Parker that prevented him from transferring to any other class of jobs.[5] That is sufficient evidence to place into question whether American perceived Parker as having an impairment that substantially limited the major life activity of working or whether Parker suffered from an impairment that substantially limited that major life activity only because of American's attitude toward Parker's impairment. Therefore, the Court concludes that there is a genuine issue of material fact as to whether American regarded Parker as being disabled.[6]

---

[5] According to American's policy, Parker could not even transfer to janitorial duties.

[6] Parker did not argue in his summary-judgment response that the evidence presented a genuine issue of material fact as to whether American perceived Parker as having an impairment that substantially limited the major life activity of working. Instead, he argued that the evidence showed that American regarded him as substantially limited in his ability to think, learn, and concentrate. (Pl.'s Br. at 21.) Parker's complaint and the joint pretrial order, however, do not limit Parker to those theories. Rather, the complaint and the joint pretrial order simply allege that American regarded Parker has having an impairment that substantially limited a major life activity. American has never demanded that Parker articulate which major life activities he alleges American regarded as being substantially impaired. And American's brief in support of its motion for summary judgment argues that it did not regard Parker as substantially limited in the major life activity of working. Thus, Parker's only obligation to survive summary judgment is to produce evidence that shows there is a genuine issue of material fact as to whether American regarded Parker as having an impairment that substantially limits a major life activity.

### ii.  Thinking, Concentrating, And Learning

Parker argues that American regarded him as substantially limited in the major life activities of thinking, learning, and concentrating.  Learning is a recognized major life activity.  29 C.F.R. § 1630.2(i); *Pryor v. Trane Co.,* 138 F.3d 1024, 1026 (5th Cir. 1998).  This circuit, however, has not decided whether thinking and concentrating are major life activities.

The Court need not decide, however, whether thinking and concentrating are major life activities, because assuming they are, the Court concludes that Parker has failed to present evidence that suggests American regarded him as disabled in those major life activities.  As discussed above, Parker's evidence suggests that American may have regarded him as substantially limited in the major life activity of working.  This evidence, however, does not suggest that American regarded Parker as substantially limited in the major life activities of thinking, learning, and concentrating.  And Parker has not presented any other evidence to suggest otherwise.

### iii. Qualified Individual

American contends that summary judgment is appropriate because Parker has failed to establish that he was otherwise qualified for the parts-washer position.  American argues that Parker was not qualified for the parts-washer position because Parker's work

restriction precluded him from working under stressful conditions imposed by narrow time constraints. But there is no evidence that American restricted Parker from taking a position that had a high level of stress and required the individual to operate under strict time constraints. American only restricted Parker from signing off on any mechanical flight releases, which is not an essential function of the parts-washer position.

American continues that Parker's treating physician had placed physical restrictions on Parker that would prevent him from performing the parts-washer job. While that is true, the union's physician found that Parker had the ability to perform a "heavy PDL" and that Parker could perform all of the physical demands for the AMT position. Because the physical requirements for performing the parts-washer position are not more onerous than for the AMT position, there is a genuine issue of material fact as to whether Parker was qualified for and could perform all of the essential functions of a parts-washer despite his permanent restriction. *See Turco v. Hoechst Celanese Chem. Group,* 101 F.3d 1090, 1093 (5th Cir. 1996)(qualified individual is "one who is able to meet all" of the job's requirements "in spite of his handicap")(internal quotations and citations omitted).

iv.  Adverse Employment Action Taken Solely Because Of Disability

American contends that Parker "has produced no evidence that

20

the sole reason for American's failure to transfer him to the parts-washer position was because American regarded him as disabled." (Def.'s Br. at 16.) American bases its argument on the erroneous view that to make out a *prima facie* case of disability discrimination, a plaintiff "must also demonstrate that any alleged discriminatory action was taken **solely** because American regarded him as disabled." (*Id.*)(Emphasis in original.)

In *Pinkerton v. The U.S. Dept. of Education,* 518 F.3d 278, 284 (5th Cir. 2007), the Fifth Circuit held that under "a straightfor-ward reading of the" ADA, "the 'motivating factor' test should be applied to ADA claims." It further stated, "Congress intended the ADA to cover situations in which discrimination on the basis of disability **is one factor, but not the only factor**, motivating an adverse employment action." *Id.* (internal quotations and citations omitted)(emphasis added). The Court concludes that there is a genuine issue of material fact as to whether American's perception of Parker's limitation was a factor in its refusal to allow Parker to transfer to any other position in American.

> v. American's Legitimate, Non-Discriminatory Reason

American contends that "all of [its] actions were taken for legitimate, non-discriminatory reasons." (Def.'s Br. at 16.) American posits that it "failed to transfer [Parker] to the parts-

washer position . . . because of the comprehensive labor agreement and past practice between the [union] and American," which "required [that Parker] be released or cleared to return to his AMT position before he could exercise his contractual-transfer rights under the" collective-bargaining agreement. (*Id.*)

The summary-judgment evidence, however, indisputably shows that American had unilaterally imposed a transfer-restriction policy on union members' exercising their contractual rights to transfer under the collective-bargaining agreement.[7] But even assuming American's transfer-restriction policy is a past practice that has become implied in the collective-bargaining agreement, the Court concludes that American has failed to meet its burden of articulating a legitimate, nondiscriminatory reason for its action.

To meets its burden, American is required to "articulate a non-discriminatory reason *with 'sufficient clarity'* to afford the [plaintiff] a realistic opportunity to show that the reason is pretextual." *Patrick,* 394 F.3d at 317 (emphasis in original). To rebut a plaintiff's *prima facie* disability-discrimination case, a defendant-employer "must articulate in some detail a more specific reason than" vague and conclusional statements regarding the

---

[7] American concedes that the collective-bargaining agreement is silent on American's unilaterally imposed transfer-restriction policy. It nonetheless argues that the labor agreement between it and the union includes all practices, customs, and courses of dealing. Indeed, the Supreme Court has acknowledged that a collective-bargaining agreement may include implied as well as express terms and that "the parties' practice, usage, and custom is of significance in interpreting" an agreement. *Conrail v. Railway Labor Executives' Ass'n,* 491 U.S. 299, 311-12 (1989).

reasons for its actions. *See Id.* American has failed to meet this standard because it simply and conclusorily states it refused to transfer Parker because it had a transfer-restriction policy in place that, because of past practice, may be a part of the collective-bargaining agreement.

American has not explained why this policy is extant in the first place or what legitimate and non-discriminatory concerns its policy purports to address. Nor does it reveal why a less-restrictive policy could not be used to enable the continued employment of one whose impairment prevents him from performing his original job but does not prevent him from performing any number of other jobs. American has also failed to articulate why the use of a waiver in special or certain circumstances is never possible.

In reality, all American has proffered is that it is its policy, which arguably is a part of the collective-bargaining agreement, not to allow an employee with a medical restriction to transfer to any other position in American until he has been cleared to return to full duty. It is just such a policy that the ADA was enacted to make illegal. Accordingly, American has failed to meet its burden of providing a legitimate, non-discriminatory reason for not allowing Parker to transfer to the parts-washer position or any other position in American because "neither [the Court] nor [Parker] can identify the kind of evidence needed to demonstrate that such a rank generalization is or is not

23

pretextual." *Id.* American's reason amounts to nothing more than a "content-less and nonspecific" statement. *Id.*

Since American has failed to meet its burden, Parker's *prima facie* case stands. *See Id*. at 316. Therefore, Parker is not required at this juncture to adduce evidence suggesting that American's proffered reason is a pretext.[8]

### vi.  Reasonable Accommodation

American argues that Parker's claim that it failed to reasonably accommodate him must fail because he failed to request a reasonable accommodation. The Court agrees.

Generally, "it is the responsibility of the individual with the disability to inform the employer that an accommodation is needed." *Taylor v. Principal Fin. Group,* 93 F.3d 155, 165 (5th Cir. 1996)(internal quotations and citations omitted). After a request has been made, "the appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the qualified individual with a disability." *Id.* Put another way, "the responsibility for fashioning a reasonable accommodation is shared between the employee and employer," but "it is the employee's initial request

---

[8]  It should also be noted that EEOC regulations prohibit an employer from entering into a contractual agreement "that has the effect of subjecting the [employer's] own qualified applicant or employee with a disability to the discrimination prohibited by" the ADA.  29 C.F.R. § 1630.6(a).  A contractual agreement includes a collective-bargaining agreement.  29 C.F.R. § 1630.6(b).

for an accommodation [that] triggers the employer's obligation to participate in the interactive process of determining one." *Id.* Thus, "if the employee fails to request an accommodation, the employer cannot be held liable for failing to provide one." *Id.*

Parker claims his first request for a reasonable accommodation came when the independent doctors tasked with testing his cognitive ability recommended that Parker only have temporary restrictions for a probationary period so that his ability to perform his job could be assessed by his supervisors and his performance would be directly supervised. (Pl.'s Br. at 31-32.) The Court fails to see how this translates into a request for a reasonable accommodation. That independent doctors who administered the cognitive-abilities tests made work-related recommendations does not equate to asking American for a reasonable accommodation. Parker readily admits that he never personally asked his supervisor for any accommodation, never submitted a request to American's Accommodation Review Board, and never sought any re-evaluation from the medical board.

Parker contends his second request for an accommodation occurred when he applied for a transfer to the aircraft-cleaner, parts-washer, and overhaul-support-mechanic positions, and when he provided American with the letter from Dr. Yentis opining that Parker was capable of performing those positions. (Pl.'s Br. at 32.) Parker argues, American "reacted to this reasonable accommodation request by immediately revoking its approval of the

transfer." (*Id.*) But, again, the Court fails to see how this translates into a request for a reasonable accommodation.

The undisputed evidence shows that Parker was laid off while he was on medical leave as part of American's reduction in force. Although Parker had a right under the collective-bargaining agreement to seek to be recalled to American's workforce, Parker admits that he lacked the seniority to regain his former position as an AMT. His making a "bid" for the aircraft-cleaner, parts-washer, and overhaul-support-mechanic positions is more properly viewed as Parker's exercising his contractual-recall rights and transfer rights, not as requesting a reasonable accommodation.

Parker's failure to request a reasonable accommodation does not bar his claim that he suffered disability discrimination. *See Workman,* 165 F.3d at 467 ("However, Workman was terminated. If Frito-Lay regarded her as disabled and would not reinstate her despite the fact that she did not need an accommodation, [it] would be liable for discrimination under the ADA.").

### vii. Record Of Disability

In his deposition, Parker stated that his sole claim in this lawsuit, as it relates to disability discrimination, is that American perceived him as being disabled. Specifically, the deposition reads:

> Q. (BY MR. CAWYER) Okay. So—so your sole
> claim in this lawsuit, as it relates to dis-

> ability discrimination, is not that you were
> ever disabled or have a record of a disabil-
> ity, but American perceived you as disabled?
>
> MR. BRIGHT: Objection.
>
> A.  Correct.

(Def.'s App. at 16.)  Still, Parker argues that American also discriminated against him on the basis of his having a record of a disability.

The Court concludes that Parker's admission in his deposition to American that his "sole claim" for disability discrimination is that American regarded him as being disabled is a judicial admission waiving or abandoning that claim.  *See Martinez v. Bally's La., Inc.,* 244 F.3d 474, 476-77 (5th Cir. 2001).  Parker's admission was not for any other purpose except to notify American that he was not seeking to hold it liable under that theory of disability discrimination.  That had the effect of discouraging American from further developing related facts during discovery necessary to defend against a claim of record of disability.  *Id.*

The Court also overrules Parker's objection to American's question.  First, Parker simply objected, he did not state the grounds for his objection.  Thus it is waived.  Regardless, his objections are meritless.

Parker argues that the question "calls for legal opinions from a non-legally trained or experienced lay witness doing his first deposition."  (Pl.'s Sur-Reply at 5.)  He also argues that the

question called for speculation and was compound and misleading. The Court disagrees. American's question does not call for any legal opinion, but simply clarification as to what Parker's disability-discrimination entails. It also does not call for any speculation; Parker has personal knowledge as to how he is claiming American discriminated against him. And it was not a compound or confusing question.

### 3. Retaliation Claim

Section 451.001 of the Texas Labor Code provides that an employer "may not discharge or in any manner discriminate against an employee because the employee has . . . filed a workers' compensation claim in good faith . . . ." Tex. Lab. Code § 451.001. A *prima facie* case requires showing that Parker participated in an activity protected under the act, he suffered an adverse employment action, and there is a causal connection between the two. *See Bergen v. Cont'l Cas. Co.,* 368 F. Supp. 2d 567, 581 (N.D.Tex. 2005)(Sanders, J.). For purposes of summary judgment, American concedes Parker participated in a protected activity under the act, and concedes that Parker suffered an adverse employment action. American argues that Parker has failed to present any evidence of a causal connection between the two.

Parker bears the ultimate burden and must demonstrate a casual link between the adverse employment action and the workers'

compensation claim. *See Chhim v. University of Houston, et al.,* 76 S.W.3d 210, 218 (Tex.App.—Texarkana [6th Dist.] 2002, pet. denied). In other words, Parker must show that "but for" his institution of a workers' compensation claim, American's adverse employment action "would not have occurred when it did." *Id.*

Proof of a causal connection "may be established by direct or circumstantial evidence and by reasonable inferences [that] may be drawn from such evidence." *West v. Maintenance Tool & Supply Co.,* 89 S.W.3d 96, 105 (Tex.App.—Corpus Christi [13th Dist.] 2002, no pet.); *Benners v. Blanks Color Imaging, Inc.,* 133 S.W.3d 364, 369 (Tex.App.—Dallas [5th Dist.] 2004, no pet.). Parker need only show "that the institution of [his claim] was at least a determining factor in the discriminatory conduct." *Chhim,* 76 S.W.3d at 218. This can be accomplished by evidence of discriminatory treatment relative to similarly situated employees, the employer's failure to adhere to established policies, knowledge of the complaint by the responsible decisionmakers, the falsity of the reason for the adverse employment action, and an expression of a negative attitude toward the employee's physical condition. *See Bergen,* 368 F. Supp. 2d at 580. Parker need not present evidence on all of these factors to make out his *prima facie* case. *Id.* at 581.

Once Parker establishes his *prima-facie* case, the burden shifts to American "to establish a valid, nondiscriminatory reason for that action." *Chhim,* 76 S.W.3d at 220. American's reason must

demonstrate that its adverse employment action "was unrelated to" Parker's pursuit of workers' compensation benefits. *Id.* Thereafter, the burden shifts back to Parker to prove that American's proffered reason "was a pretext for discrimination . . . ." *Benners,* 133 S.W.3d at 369. Parker can accomplish this by providing "evidence of a retaliatory motive" or by challenging "the employer's summary-judgment evidence as failing to prove as a matter of law that the reason given was a legitimate, non-discriminatory reason." *Bergen,* 368 F. Supp. 2d at 580 (internal quotations and citations omitted).

Parker concedes that he has no direct evidence of retaliation but maintains "in this case, the circumstantial evidence is temporal-proximity evidence." (Pl.'s Br. at 34.) The temporal-proximity is the time between his release to return to full duty by the union's doctor and the medical board's decision to require Parker to undergo the series of tests to measure his cognitive abilities. Parker claims two other items of "corroborative" proof: First, he contends American ignored the recommendations of the independent doctors for only a temporary restriction and for Parker to be supervised and, instead imposed a permanent restriction. The second is American's transfer-restriction policy.

Parker's evidence is insufficient. The appropriate temporal proximity is between the time he filed the claim and the adverse employment action. *See Porterfield v. Galen Hospital Corp., Inc.,*

948 S.W.2d 916, 919 (Tex.App.——San Antonio [4th Dist.] 1997, writ denied)("Temporal proximity between the claim and the dismissal has been considered to be circumstantial evidence of retaliatory motive."); *Johnson v. Moody Int'l, Inc.,* No. 14-07-00213-CV, 2007 Tex.App. LEXIS 8187, * (Tex.App.——Houston [14th Dist.] Oct. 11, 2007, no pet)("the relevant time period to be considered is the time between the protected activity——in this case, the filing of the workers' compensation claim——and the termination"). Parker was cleared to return to full duty around two years after filing his workers' compensation claim.

Additionally, the evidence suggests that American's concern regarding his cognitive abilities was the impetus behind its decision to have Parker undergo a series of tests and, later, to permanently restrict him from signing off on any mechanical flight releases. There is no evidence that American's decision was motivated by any animosity for Parker's filing a workers' compensation claim some two years earlier. This is buttressed by evidence that American did not stand in the way of Parker's exercising his contractual-recall rights. In fact, American initially welcomed and approved Parker's bid for the parts-washer position, and it was only after American realized it had placed him on permanent restriction that it revoked its approval. This evidence does not suggest any retaliatory motive on the part of American. At best, it suggests that American may have regarded Parker as disabled and

discriminated against him in violation of the ADA.

Finally, Parker admits that no employee, supervisor, or manager ever expressed a negative attitude regarding his injury or his decision to file a claim. He presents no evidence that he suffered discriminatory treatment as compared to other similarly situated employees. And he presents no evidence that the medical board or the person revoking his approval to transfer to the parts-washer position had any knowledge of his claim. Therefore, the Court concludes that Parker has failed to make out a *prima facie* case.

## III. Conclusion

For the reasons stated above, American's motion for summary judgment is PARTIALLY GRANTED AND PARTIALLY DENIED. The Court concludes that there is a genuine issue of material fact as to whether American discriminated against Parker because it regarded him as disabled. American is not liable for failing to provide Parker with reasonable accommodation because Parker failed to request any reasonable accommodation from American. Parker has waived or abandoned his claim of disability discrimination based on

a record of disability.  And Parker has failed to make out a *prima facie* case under the Texas Workers' Compensation Act.

SIGNED July 22, 2008.

_Terry R. Means_

TERRY R. MEANS
UNITED STATES DISTRICT JUDGE